IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SAINT JOSEPH DIVISION

| | |
|---|---|
| ERNEST J. KRAMER and ELLA I. KRAMER, Co-Guardians and Co-Conservators of the ESTATE OF CHRISTOPHER THOMAS KRAMER, Protectee, <br><br> Plaintiffs, <br><br> v. <br><br> TROOPER JIM DAVID FARMER, in his Official and Individual Capacities, Maryville, Missouri 64468, <br><br> and <br><br> OFFICER SETH RUCKER, in his Official and Individual Capacities, Maryville Public Safety Department 222 E. 3rd Street Maryville, Missouri 64448, <br><br> and <br><br> OFFICER TYLER SALSBURY, in his Official and Individual Capacities, Maryville Public Safety Department 222 E. 3rd Street Maryville, Missouri 64448, <br><br> and <br><br> OFFICER JOHN VAUGHT, in his Official and Individual Capacities, Maryville Public Safety Department 222 E. 3rd Street Maryville, Missouri 64448, <br><br> and | Case No. 5:17-CV-6008 <br><br> JURY TRIAL DEMANDED |

| | )|
|---|---|
| DEPUTY AUSTIN HANN, in his | ) |
| Official and Individual Capacities, | ) |
| Nodaway County Sheriff's Office | ) |
| 404 North Vine Street | ) |
| Maryville, Missouri 64468, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

COME NOW Plaintiffs Ernest J. Kramer and Ella I. Kramer, Co-Guardians and Co-Conservators of the Estate of Christopher Thomas Kramer, and for their cause(s) of action against Defendants Trooper Jim David Farmer, Officer Seth Rucker, Officer Tyler Salsbury, Officer John Vaught, and Deputy Austin Hann, state and allege as follows:

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues raised herein.

### NATURE OF ACTION

1. Plaintiffs Ernest J. Kramer and Ella I. Kramer, Co-Guardians and Co-Conservators of the Estate of Christopher Thomas Kramer, bring this lawsuit against Defendants Trooper Jim David Farmer, Officer Seth Rucker, Officer Tyler Salsbury, Officer John Vaught, and Deputy Austin Hann alleging that on May 6, 2016, Christopher Kramer was wrongfully and unlawfully seized in that he was detained without reasonable, articulable suspicion and in that in the course of being detained, he was subjected to excessive force, all in violation of the Fourth and Fourteenth Amendment to the United States Constitution.

### PARTIES

2. Plaintiffs Ernest J. Kramer and Ella I. Kramer, Co-Guardians and Co-Conservators

2

of the Estate of Christopher Thomas Kramer[1] are the parents of Chris Kramer. At all times relevant hereto, they resided in Maryville, Nodaway County, Missouri. Chris Kramer lives with them.

3. Defendant Trooper Jim David Farmer is a State Trooper employed by the Missouri State Highway Patrol. On information and belief, Farmer is a resident of Maryville, Nodaway County, Missouri and may be served at his residence. At all times relevant hereto, Farmer was acting under color of state law and he is sued in his individual and official capacities.

4. Defendant Officer Seth Rucker is a Public Service Officer employed by the Patrol Division of the Maryville Public Safety Department. On information and belief, he is a resident of Nodaway County, Missouri. He may be served at the Maryville Public Safety Department, 222. E. 3rd Street, Maryville, Missouri. At all times relevant hereto, Rucker was acting under color of state law and he is sued in his individual and official capacities.

5. Defendant Officer Tyler Salsbury is a Public Service Officer employed by the Patrol Division of the Maryville Public Safety Department. On information and belief, he is a resident of Nodaway County, Missouri. He may be served at the Maryville Public Safety Department, 222. E. 3rd Street, Maryville, Missouri. At all times relevant hereto, Salsbury was acting under color of state law and he is sued in his individual and official capacities.

6. Defendant Officer John Vaught is a Public Service Officer employed by the Patrol Division of the Maryville Public Safety Department. On information and belief, he is a

---

[1]Because the plaintiffs and Christopher Kramer share the same surname and for the sake of clarity, they and Chris may be referred to herein by first name. No disrespect is intended.

resident of Nodaway County, Missouri. He may be served at the Maryville Public Safety Department, 222. E. 3rd Street, Maryville, Missouri. At all times relevant hereto, Vaught was acting under color of state law and he is sued in his individual and official capacities.

7. Defendant Deputy Austin Hann is a Nodaway County Deputy employed by the Nodaway County Sheriff's Department. On information and belief, he is a resident of Nodaway County, Missouri. He may be served at the Nodaway County Sheriff's Department, 404 North Vine Street, Maryville, Missouri.

## JURISDICTION AND VENUE

8. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

9. The Court has jurisdiction over Defendants because the unlawful acts alleged in this Complaint were committed in Maryville, Nodaway County, Missouri, which lies within the Western District of Missouri.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events, acts, or omissions giving rise Plaintiffs' claims occurred in Maryville, Nodaway County, Missouri, which, as provided in 28 U.S.C. § 105(b)(3), lies within the St. Joseph Division of the Western District of Missouri.

## GENERAL ALLEGATIONS

11. As alleged, *supra*, § 2, Chris Kramer is the son of Plaintiffs Ernest J. Kramer and Ella I. Kramer.

12. Plaintiffs Ernest J. Kramer and Ella I. Kramer are the duly appointed Co-guardians and Co-conservators of the Estate of Christopher Thomas Kramer, Protectee, by virtue of the Judgment of the Probate Division of the Circuit Court of Nodaway County,

4

Missouri, Estate No. 16ND-PR00168, entered December 15, 2016, and Letters of Guardianship of an Incapacitated Person and Conservatorship of a Disabled Person issued that same day.

13. Chris Kramer is a white male who, on May 6, 2016 was eighteen years of age having been born in December, 1997.

14. Chris has a form of autism and that is the basis for his incapacity and disability. He has impairments in comprehension and speech.

15. In May, 2016, Chris was in the last semester of his senior year at Maryville High School where he was a special education student.

16. Chris was a good student and he was on the Maryville High School Track Team for three years.

17. Chris enjoys running and, as he knows the city well, he runs throughout Maryville even when it is not track season.

18. On May 6, 2016, late in the afternoon, Chris went for a run.

19. Chris' route that afternoon took him from his home at approximately First Street and North Grand, north on College Park Drive to West 16th Street where he turned east. Chris continued eastbound on 16th Street, crossing Main where the street became East 16th Street. At the intersection of East 16th Street and North Dewey Street, he turned south on North Dewey and continued to East 7th Street where he turned east again, and ran to East 7th and North Laura Street where Beal Park is located. (The route from the Kramer house to Beal Park is a little over 3 miles.)

20. At Beal Park, intending to return home, Chris reversed his route, running back of

5

North Laura Street to East 7th Street where he turned west. At Dewey Street, he turned north and ran to the intersection of North Dewey and East 16th Street.

21. Trooper Farmer's residence is on the north side of East 16th Street between North Dewey and Main Streets.

22. East of North Dewey Street, on the north side of East Main Street, the sidewalk ends, and more particularly in front of Trooper Farmer's home, there is no sidewalk so at that point, Chris began running in the grass, including the grass on the edge of Trooper Farmer's yard.

23. Chris, tired from running, stopped at the edge of the property to tie his shoe. At that point he saw a man wearing a tee shirt and shorts, later identified as Trooper Farmer, appear in the yard. When Trooper Farmer yelled at Chris asking, in effect, "Can I help you with something?", Chris became frightened, did not respond to the man, and resumed running. As he ran, he heard the man yell at him to stop, but he continued running.

24. Trooper Farmer followed Chris to the intersection of Main Street and East 16th, abandoned the chase and instead, telephoned the Maryville Police Department and spoke with the dispatcher.

25. The conversation between the dispatcher and Trooper Farmer proceeded as follows:

Dispatch: Public Safety.

Farmer: Hey, this is Trooper Farmer.

Dispatch: How you doing, sir?

Farmer: You guys got anybody over here near, ah, East or West 16th?

| | | |
|---|---|---|
| Dispatch: | Ah . . .. I probably can. What you got going on? | |
| Farmer: | Well, there's a kid. He's in a red t-shirt, grey shorts with a white stripe, tennis shoes. He started up through my yard there. When I hollered at him, he took off runnin'. Now he was kinda headed toward my front door. Then, then when I hollered at him he took off runnin' and he's goin', he's goin' down West 16th right now. | |
| Dispatch: | Okay. Describe what he's wearing again. | |
| Farmer: | It's a red t-shirt. Got grey shorts with a white stripe down the side of 'em. A pair of tennis shoes. | |
| Dispatch | Okay. | |
| Farmer: | Brown headed kid. White male. Probably in his late teens, early twenties. | |
| Dispatch: | Alright. He's, heading West, heading down West 16th right now? | |
| Farmer: | Yeah, Yeah. Like I say. I hollered at him, he took off. | |
| Dispatch: | Okay. Uh, you got a cross street for me? | |
| Farmer: | Main. | |
| Dispatch: | Alright. Uh, if he changes directions or anything, feel free to call me back, Okay? | |
| Farmer: | Yeah. I'm going back to the house. I'm in a pair of boots and I'm not running after him no more. | |
| Dispatch: | Okay. Alright. Thanks, Farmer. | |
| Farmer: | Yep. Bye. | |

26. Nothing about what Trooper Farmer relayed to the dispatcher would give rise to a reasonable, articulable suspicion based on a law enforcement officer's experience that criminal activity was afoot.

27. Given what Trooper Farmer reported, there was no particularized and objective

7

basis for suspecting Chris of criminal activity nor were there any specific and articulable facts to give rise to reasonable suspicion that he was engaged in criminal activity.

28. The totality of the circumstances with which Trooper Farmer was presented, the information known to him, and any reasonable inferences that could be drawn therefrom were:

    a. Chris, a teenage male, stopped at the east side of his property and then proceeded through the Farmer yard and at one point was "was kinda headed" toward the front door;

    b. when Farmer "hollered at him, he took off runnin'" (presumably, what Farmer wanted, *i.e.*, Chris left Farmer's property);

    c. Chris white with brown hair and was wearing a red tee shirt and gray shorts with "white stripe down the side of 'em";

    d. there was nothing that Farmer saw that would indicate that Chris was armed or otherwise dangerous; and,

    e. it was early in May, a little before 5:00 p.m., so it was broad daylight in a neighborhood which was not a high crime area.

None of these circumstances, and looking at them collectively in light of the significance an experienced law enforcement officer would attach to them, would warrant a *Terry* stop, *i.e.*, a brief investigatory stop based on a reasonable, articulable suspicion of criminal activity by Chris.

29. The dispatcher then relayed Farmer's report to Maryville Public Safety Officers, in the following exchange:

| | |
|---|---|
| Dispatch: | Maryville 214 [PSO Rucker], respond to the area of West 16th and Main, the area of Casey's. Uh, RP390, *that's Trooper Farmer*, said a teenage male individual *came up to his front door*. Farmer confronted him and the kid took off running. |
| 214: | Copy. Any other information as to what he did *when he walked up to the door*? |
| Dispatch: | Negative. Farmer said that the individual walked through his yard and acted as if he was going to go to the individual's, go to Farmer's front door. Farmer confronted him and the kid took off running. Gonna be a white male. Brown hair. Wearing a red t-shirt. Grey shorts with a white stripe down the side. |
| 214: | OK. Then I'll come First and Depot. |
| Dispatch: | Copy. |
| Unknown: | Then I'll head that way, too. I'm at South Ave and Main, though. |
| Dispatch: | Copy. |

30. Although the dispatcher indicated that the report had come from Trooper Farmer, what the dispatcher relayed to the officers did not give rise to a reasonable, articulable suspicion based on a law enforcement officer's experience that criminal activity was afoot.

31. Given what the dispatcher stated was Trooper Farmer's report, there was no particularized and objective basis for Officers Rucker, Salsbury, Vaught, or Deputy Hann to suspect Chris of criminal activity nor were there any specific and articulable facts to give rise to reasonable suspicion that he was engaged in criminal activity.

32. The totality of the circumstances with which the Officers and Deputy Hann were presented, the information made known to them by the dispatcher, and any reasonable inferences that could be drawn therefrom were:

a. the dispatcher first related that Chris, a teenage male, "came up to [Farmer's] front

9

door" – which Farmer did not say, but which Rucker understood to mean "walked up to the door", but the dispatcher then restated as, "the individual walked through his yard and acted as if he was going to go to . . . Farmer's front door;

b. when Farmer "confronted him" – again, the dispatcher's characterization of what Farmer had said, not Farmer's words – "the kid took off running";

c. Kramer was white with brown hair and was wearing a red tee shirt and grey shorts with a white stripe down the side;

d. the dispatcher had not communicated that Chris had done anything that would constitute a crime;

e. the dispatcher had not indicated that Chris had been reported as being armed or otherwise dangerous;

f. it was early in May, a little before 5:00 p.m., so it was broad daylight in a neighborhood which was not a high crime area; and,

g. the report had come from a person known to be a law enforcement officer but the content of the report did not rise to the level of reporting an actual crime as having occurred or possibly occurring.

Looking at these circumstances, individually and collectively in light of the significance an experienced law enforcement officer would attach to them, only one of them – the fact that the report had come from a law enforcement officer – could arguably weigh in favor of a *Terry* stop, *i.e.*, a brief investigatory stop based on a reasonable, articulable suspicion of criminal activity by Chris, being warranted.

33. Even though the report had come for Trooper Farmer, known to the Officers and

Deputy Hann to be law enforcement, and could be considered reliable, even if true, the content of what Farmer reported did not rise to the level of providing reasonable, articulable suspicion of criminal activity by Chris.

34. Responding to the dispatch, Officer Rucker and Deputy Hann arrived at the area of West 16th and North College Drive at about the same time and they saw a male, whom they later identified as Chris, who matched the description given by the dispatcher.

35. Deputy Hann pulled his vehicle up behind Chris and, as he did so, Officer Rucker began to pull his patrol car around the front side of Hann's vehicle.

36. As Rucker was passing Hann's vehicle, Chris turned back toward Hann and then began running toward the west.

37. Rucker angled his patrol car toward the curb in front of Chris in an attempt to contain him.

38. About a week earlier, Chris had been detained by members of the Northwest Missouri State University Police Department and had been extremely frightened by the experience.

39. When Chris realized that Officer Rucker and Deputy Hann were trying to engage him, the intense fear he had experienced during his encounter with University Police the previous week recurred and he began running. Officer Rucker and Deputy Hann gave chase on foot.

40. Chris did not comprehend why the officers were chasing him because, as was the case the week before in the encounter with the University Police, he had not done anything wrong, but he was being pursued.

41. The officers shouted commands at Chris, but in his terrified state and with limited comprehension, he did not stop.

42. Officer Rucker removed his Taser from its holster, pointed it at Chris, and ordered him to stop or be tased. Chris had no comprehension of what a Taser was or what it could do. Chris kept running, out of the range of Rucker's Taser.

43. Meanwhile, Officer Salsbury arrived in his patrol car and attempted to get his vehicle in front of Chris to contain him, but Chris turned and ran west. When Officer Salsbury again attempted to move his patrol car in front of Chris, Chris ran to the back side of the patrol car and headed south.

44. Officer Salsbury then got out of his vehicle and gave chase on foot. Within a short distance, Office Salsbury caught up with Chris and tackled Chris, taking him to the ground.

45. As Officer Salsbury and Chris were wrestling on the ground, Deputy Hann caught up with them and began to try to assist Salsbury.

46. Officer Salsbury and Deputy Hann began shouting commands at Chris to "quit resisting" and to "get on the ground", commands which Chris had never encountered and did not understand. Chris, still extremely frightened and now in a heightened state of agitation, began wailing, screaming, "I don't", "no", "I want", and crying. Chris got off of the ground, but was again taken to the ground.

47. As Chris continued to wail and scream in fright, Officer Rucker then advised Salsbury and Hann that he was going to deploy his Taser. Rucker shot two probes into Chris' right shoulder, then placed his Taser on Chris' buttocks and "drive stunned" Chris

with the Taser again. That tasing "locked up" Chris temporarily.

48. Just as the Taser's effect decreased, Chris again managed to get off the ground and to his feet and attempted to flee. Rucker tased him again, but that did not result in getting control of Chris.

49. Officer Salsbury and Deputy Hann again took Chris to the ground and continued shouting commands at him. Officer Rucker tased Chris a fifth time. Chris continued to struggle and wail, now not only frightened but in pain as well, but managed to again gain his footing.

50. Officer Rucker then tackled Chris, taking him to the ground once again.

51. Officer Salsbury then began to strike Chris in the legs with an expandable baton to gain compliance with the orders that the officers continued to shout at Chris.

52. Chris, confused, frightened, and in pain, and not understanding at all what was happening or why, continued to struggle, cry that he wanted to go home and ask why "police car coming". He repeatedly cried, "I don't want", "want to go please", "got to go home, please", and "got go, please". The officers continued to try to handcuff him and restrain his legs.

53. As Chris thrashed about, he made contact with Salsbury and Rucker and Rucker hit Chris three times in the left side of his face with his fist. As the struggle continued, Rucker again hit Chris in the left side of his head and forced him back to the ground.

54. Meanwhile, Officer Vaught arrived on the scene and he drive stunned Chris twice with his Taser when Chris did not comply with commands to put his hands behind his back.

55. Chris continued to wail and cry, but eventually, the officers got him handcuffed.

56. Recognizing that Chris had some injuries sustained during the struggle, not to mention the multiple tasings he had sustained, Officer Vaught summoned an ambulance.

57. As Chris began to calm down, the officers began to loosen their grip on him.

58. The officers finally realized that they were dealing with an individual who had a disability and began de-escalating the situation.

59. Chris continued to calm down, and as he did so, Officer Vaught loosened his handcuffs.

60. The ambulance arrived, and Chris was helped to his feet and into the ambulance so that his injuries could be evaluated. He had grown even calmer and Vaught removed the handcuffs, talking with Chris while the ambulance personnel tended to him.

61. Meanwhile, a University Police Officer attempted to contact Chris' parents.

62. Chris repeatedly stated that he needed to find his phone and Deputy Hann located it in the grass. Chris' cell phone case contained a Maryville High School ID card which provided the officers with Chris' name. Deputy Hann gave Officer Vaught Chris' cell phone and Vaught gave the phone to Chris.

63. Chris began to type on his phone. Officer Vaught looked at what Chris was doing, realized that Chris was trying to text his mother, and told him that he should not send his mother a text like that because it might confuse or scare her. Chris began to type something about the police.

64. Officer Vaught then asked Chris if he could use the phone to call his mom or dad and Chris gave the phone to him. Officer Vaught dialed the phone number and Chris' father, Plaintiff Ernest Kramer, answered the phone. Officer Vaught advised him that they were

14

with Chris, told him that they needed him to come to the scene, how to get there from where he was, and gave him a short explanation of what had transpired indicating that there had been a report that Chris had gone to the front door and/or tried to enter a house.

65. Chris' parents arrived at the scene and asked questions and for more detail about the report that had initiated the officers' actions. Officer Vaught gave limited information to Plaintiffs Ernest and Ella Kramer but made no mention of the multiple tasings.

66. After a short time, the ambulance personnel finished evaluating Chris and Chris was released to his parents. No charges were then filed against Chris and none have since been filed.

67. After leaving the scene, Chris and his parents drove to Farmer's house and parked nearby. Chris' parents asked him to show them where he had been and what he had done.

68. Plaintiffs and Chris observed that there were Maryville Police Officers talking outside the house with Trooper Farmer who was clad in shorts and a tee shirt.

69. Ernest Kramer asked Trooper Farmer what had happened and Farmer stated that while on his tractor, he saw Chris at a tree on the east side of the property bending down.

70. The Kramers asked Trooper Farmer if Chris had gone into the back yard and Farmer replied that Chris had not. Farmer indicated that he had gone around the back of the house and by then Chris was on the west side of the house and that he had seen Chris there, too.

71. Ernest Kramer asked Trooper Farmer if he had been wearing a uniform or had shown Chris a badge and Farmer replied that he had not.

72. Ernest Kramer asked why Chris – or anyone – would need to stop without there

15

being any indication that Trooper Farmer was indeed a law enforcement officer and Trooper Farmer stated, "Because I said stop."

73. Ernest Kramer also asked Trooper Farmer if Chris had gone to the door or had gone in the house and Farmer replied that he had not, stating, "I never said that."

74. Chris told his parents that he had just been on the grass and had never attempted to go to the door or near the house.

75. In addition to being tackled and wrestled to the ground on multiple occasions, Chris sustained scrapes, bruises, and lacerations to his face, back, thighs, and knees as well as swelling on the left side of his head and face where he had been hit by Officer Rucker. He suffered excruciating pain as a result of being tased seven times. Chris was terrified by the incident; he suffered apprehension, mental distress, anxiety, and emotional pain and suffering.

76. The actions of Defendants were driven by an evil motive or intent, or a reckless or callous indifference to or disregard of Chris' constitutional rights by reason of which an award of punitive damages in an amount to be proved at trial is warranted.

## COUNT I: WRONGFUL DETENTION
## 42 U.S.C. § 1983
## Fourth and Fourteenth Amendments to the Constitution of the United States
## All Defendants

77. Plaintiffs hereby incorporate by reference paragraphs 1 through 76 as if fully set forth herein.

78. As alleged, *supra* at ¶¶ 3-7, at all times relevant hereto Defendants were all acting or failing to act under color of state law.

79. Reasonable police officers would not have believed that criminal activity was

16

afoot, that Chris had committed an offense, or that he had participated in an offense that was occurring and would not have believed that there was articulable, reasonable suspicion to detain Chris, *i.e.*, to conduct a *Terry* stop of Chris.

80. Defendants knew or should have known that it is clearly established that the Fourth Amendment (as made applicable to the States by the Fourteenth Amendment) prohibits stopping and detaining an individual in the absence of articulable, reasonable suspicion that criminal activity was afoot or that the individual was involved in criminal activity and that their actions violated Chris' Fourth Amendment right to be free from unreasonable seizure.

81. As alleged, *supra* at ¶¶ 23-33, the facts and circumstances available to Defendants do not warrant a person of reasonable caution in the belief that stopping and detaining Chris was appropriate.

82. As alleged, *supra* at ¶75, as a result of the actions, omissions, conduct, and behavior of Defendants, Chris suffered damages in that, in addition to being tackled and wrestled to the ground on multiple occasions, he sustained scrapes, bruises, and lacerations to his face, back, thighs, and knees as well as swelling on the left side of his head and face where he had been hit by Officer Rucker. He suffered excruciating pain as a result of being tased seven times. Chris was terrified by the incident; he suffered apprehension, mental distress, anxiety, and emotional pain and suffering.

83. The acts, omissions, conduct, and behavior of Defendants were driven by evil motive or intent, or involved a reckless or callous indifference to or disregard of Chris' constitutional rights, warranting an award of punitive damages in an amount to be proved at

17

trial but which is sufficient to punish Defendants and to deter Defendants and others similarly situated from like conduct in the future.

84. Plaintiffs are entitled to recover from Defendants their reasonable attorneys' fees, expenses, and costs, as provided by 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs request that the Court, after a trial by jury of their claims, enter judgment against Defendants for the actual or nominal damages sustained by Chris, and for punitive damages as proven at trial, for their attorney fees, expenses, and costs pursuant to 42 U.S.C. § 1988, and for any such further legal and equitable relief as the Court deems appropriate.

## COUNT II - EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS
**Defendants Rucker, Salsbury, Vaught, and Hann**

85. Plaintiffs hereby incorporate by reference paragraphs 1 through 84 as if fully set forth herein.

86. As alleged, *supra* at ¶¶ 3-7, at all times relevant hereto Defendants Rucker, Salsbury, Vaught, and Hann were all acting or failing to act under color of state law.

87. Because, as alleged in Count I, there was no reasonable, articulable suspicion to justify detaining Chris, there was no reason to use any force whatsoever on Chris to detain him.

88. A reasonable officer would not have used such force against Chris under similar circumstances.

89. The use of excessive force by Defendants Rucker, Salsbury, Vaught, and Hann in tackling Chris and hitting him with baton and fists, and particularly the excessive force used

by Defendants Rucker and Vaught in inflicting the seven tasings on Chris deprived Chris of the Fourth Amendment right (as applied to the States by the Fourteenth Amendment) to be free from unreasonable seizure and from excessive use of force.

90. Defendants knew or should have known that the excessive use of force alleged above violated Chris' Fourth Amendment right (applicable through the Fourteenth Amendment) to be free of excessive force.

91. As alleged, *supra* at ¶ 75, the conduct of Defendants Rucker, Salsbury, Vaught, and Hann as herein described caused Chris to suffer damages in that, in addition to being tackled and wrestled to the ground on multiple occasions, he sustained scrapes, bruises, and lacerations to his face, back, thighs, and knees as well as swelling on the left side of his head and face where he had been hit by Officer Rucker. He suffered excruciating pain as a result of being tased seven times. Chris was terrified by the incident; he suffered apprehension, mental distress, anxiety, and emotional pain and suffering.

92. The conduct of Defendants Rucker, Salsbury, Vaught, and Hann was willful, wanton, reckless, and malicious, and, further shows a complete and deliberate indifference to, and conscious disregard for Chris' constitutional rights. Therefore, an award of punitive damages in an amount sufficient to punish Defendants Rucker, Salsbury, Vaught, and Hann or to deter them and others similarly situated from like conduct in the future is warranted.

93. Plaintiffs are entitled to recover from Defendants Rucker, Salsbury, Vaught, and Hann their reasonable attorneys' fees and expenses as provided by 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs request that the Court, after a trial by jury of their claims, enter judgment against Defendants for the actual or nominal damages sustained by Chris, and

for punitive damages as proven at trial, for their attorney fees, expenses, and costs pursuant to 42 U.S.C. § 1988, and for any such further legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

ARTHUR BENSON & ASSOCIATES

By  s/ Arthur A. Benson II

By s/ Jamie Kathryn Lansford
Arthur A. Benson II #21107
Jamie Kathryn Lansford #31133
4006 Central Avenue
Kansas City, Missouri 64111
(816) 531-6565
(816) 531-6688 (telefacsimile)
abenson@bensonlaw.com
jlansford@bensonlaw.com

Attorneys for Plaintiffs