# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

| | |
|---|---|
| Ernest J. Kramer and <br> Ella I. Kramer, Co-Guardians and <br> Co-Conservators of the Estate of <br> Christopher Thomas Kramer, <br> Protectee, <br>                 Plaintiffs, <br> vs. <br><br> Trooper Jim David Farmer, in his Official <br> and Individual Capacities, et al., <br>                 Defendants. | No.  17-6008-CV-SJ-FJG |

## ORDER

Pending before the Court are:  (1) Defendants Rucker, Salsbury, Vaught and Hann's Partial Motion to Dismiss (Doc. No. 11); (2) Defendant Farmer's Motion to Dismiss and Suggestions in Support (Doc. No. 15); and (3) Defendant Farmer's Unopposed Motion to [file] Reply Suggestions in Support of Motion to Dismiss Out of Time (Doc. No. 24).  As an initial matter, Defendant Farmer's motion to file reply suggestions out of time will be **GRANTED**, and the Court considers Defendant Farmer's proposed reply suggestions (Doc. No. 24-1) as timely filed.

## I.   Background

The plaintiffs bring this suit on behalf of Cristopher Kramer ("Mr. Kramer" or "Chris"), claiming Mr. Kramer was "unlawfully seized in that he was detained without reasonable, articulable suspicion and that during being detained, he was subject to excessive force, all in violation of the Fourth and Fourteenth Amendment…" (Complaint, Doc. No. 1, at 2). Mr. Kramer is alleged to have autism, and was a special education high school student at the time as well as a member of the high school track team.   Relevant to this matter, one evening while out exercising, Mr. Kramer allegedly stopped in a state

trooper's yard to tie his shoelace, and was later approached by police, who forcefully restrained and tasered him. Plaintiff brings a two count complaint: Count I against all defendants, a 42 U.S.C. § 1983 wrongful detention claim, that the defendants were driven by an evil motive or were recklessly or callously indifferent to or disregarding of Mr. Kramer's constitutional rights when they stopped and detained him in the absence of articulable, reasonable suspicion; and Count II against Defendants Rucker, Salsbury, Vaught and Hann, a claim of excessive force in violation of the Fourth and Fourteenth Amendments, that defendants' conduct "was willful, wanton, reckless, and malicious, and, further shows a complete and deliberate indifference to, and conscious disregard for [Mr. Kramer's] constitutional rights." (Doc. No. 1, at 19). Both motions to dismiss seek dismissal of Count I only.

Plaintiffs specifically allege that Mr. Kramer was running home from school. Mr. Kramer's route took him past Trooper Farmer's residence. (Doc. No. 1, at 22). Because there is no sidewalk in front of Trooper Farmer's residence, Mr. Kramer ran along the edge of the property and stopped on the edge to tie his shoe. (Doc No. 1, at 23). Trooper Farmer approached Mr. Kramer and asked, in effect, "Can I help you with something?" Id. Mr. Kramer has a form of autism that causes impairment in comprehension and speech. (Doc. No. 1, at 14.) Mr. Kramer became frightened, did not respond and resumed running. (Doc. No. 1, at 23). Trooper Farmer yelled at Mr. Kramer to stop running and briefly pursued him on foot. (Doc. No. 1, at 24-25). Trooper Farmer then ceased pursuit and called the Maryville Police Department, identified himself as a Missouri State Highway Patrolman, and requested the intervention of Maryville Police.

In his phone call to dispatch, Trooper Farmer allegedly said: "Well, there's a kid. He's in a red t-shirt, grey shorts with a white stripe, tennis shoes. He started up through

2

my yard there. When I hollered at him, he took off runnin'. Now he was kinda headed toward my front door. Then, then when I hollered at him he took off runnin' and he's goin', he's goin' down West 16th right now." (Doc. No 19, at 4).

Maryville dispatch then sent out a message to defendant Rucker: "Maryville 214 [PSO Rucker], respond to the area of West 16th and Main, the area of Casey's. Uh, RP390, that's Trooper Farmer, said a teenage male individual came up to his front door. Farmer confronted him and the kid took off running." – – PSO Rucker: "Copy. Any other information as to what he did when he walked up to the door?" – – Dispatch: "Farmer said that the individual walked through his yard and acted as if he was going to go the individual's go to [sic] Farmer's front door. . . ." (Doc. No. 19, at 6).

Officers Rucker and Hann arrived at the scene at the same time as they saw a male, later identified as Mr. Kramer. "Deputy Hann pulled his vehicle up behind [Mr. Kramer] and, as he did so, Officer Rucker began to pull his patrol car around the front side of Hann's vehicle." (Doc. No. 1, at 11). As the officers angled their vehicles to contain Mr. Kramer, Mr. Kramer began to run, Officer Rucker and Deputy Hann began to give chase on foot. The officers shouted commands at Mr. Kramer but he did not stop. (Doc. No 1, at 12). "Officer Rucker removed his taser from his holster, pointed it at [Mr. Kramer] and ordered him to stop or be tased." (Doc. No 1, at 12). Around this time, Officer Salsbury arrived in his patrol car and twice attempted to position his vehicle in front of the fleeing Mr. Kramer, to stop his progression. (Doc. No. 1, at 12). After being unable to halt Mr. Kramer by positioning his vehicle, Officer Salsbury got out of his vehicle and also gave chase on foot. (Doc. No. 1, at 12). "Within a short distance, Officer Salsbury caught up with [Mr. Kramer] and tackled [him], taking him to the ground. ¶45. As Officer Salsbury and [Mr. Kramer] were wrestling on the ground, Deputy Hann caught up with them and

3

began to try to assist Salsbury." The complaint alleges the interaction proceeds as follows:

> ¶ 46. Officer Salsbury and Deputy Hann began shouting commands at Chris [previously referred to as Mr. Kramer] to "quit resisting" and to "get on the ground" . . . Chris began wailing, screaming, "I don't", "no", "I want", and crying. Chris got off of the ground, but was again taken to the ground.
>
> ¶ 47. As Chris continued to wail and scream in fright, Officer Rucker then advised Salsbury and Hann that he was going to deploy his Taser. Rucker shot two probes into Chris' right shoulder, then placed his Taser on Chris' buttocks and "drive stunned" Chris with the Taser again. . . .
>
> ¶ 48. Just as the Taser's effect decreased, Chris again managed to get off the ground and to his feet and attempted to flee. Rucker tased him again, but that did not result in getting control of Chris.
>
> ¶ 49. Officer Salsbury and Deputy Hann again took Chris to the ground and continued shouting commands at him. Officer Rucker tased Chris a fifth time. Chris continued to struggle and wail, now not only frightened but in pain as well, but managed to again gain his footing.
>
> ¶ 50. Officer Rucker then tackled Chris, taking him to the ground once again.
>
> ¶ 51. Officer Salsbury then began to strike Chris in the legs with an expandable baton to gain compliance . . . .
>
> ¶ 52. Chris . . . continued to struggle, cry that he wanted to go home and ask why "police car coming". He repeatedly cried, "I don't want", "want to go please", "got to go home, please", and "got go, please". The officers continued to try to handcuff him and restrain his legs.
>
> ¶ 53. As Chris thrashed about, he made contact with Salsbury and Rucker and Rucker hit Chris three times in the left side of his face with his fist. As the struggle continued, Rucker again hit Chris in the left side of his head and forced him back to the ground.
>
> ¶ 54. Meanwhile, Officer Vaught arrived on the scene and he drive stunned Chris twice with his Taser when Chris did not comply with commands to put his hands behind his back.
>
> ¶ 55. Chris continued to wail and cry, but eventually, the officers got him handcuffed.

Complaint, Doc. No. 1, at 12-13.

## II. Standard

On a motion to dismiss, the court shall "accept all facts pled by the nonmoving party as true and draw all reasonable inferences from the facts in favor of the nonmovant." Waldron v. Boeing Co., 388 F.3d 591, 593 (8th Cir. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## III. Defendant Farmer's Motion to Dismiss (Doc. No. 15)

Defendant Farmer argues that he was not personally involved or responsible for the detention of Mr. Kramer sufficient for plaintiffs to state a cause of action. The Eighth Circuit in Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir. 2006) held that "[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of [defendants, the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." (internal citations omitted). The question is whether Defendant Farmer's involvement up to and including his phone call to Maryville police constitutes the requisite causal link to the later encounter between Mr. Kramer and the Maryville police.

Defendant Farmer asserts that he is not responsible for what happened after his telephone call to police dispatch, as (1) he was not in the vicinity of the detention, (2) his phone call does not constitute participation in an arrest, (3) whether the information passed on to dispatch gives rise to a reasonable, articulable suspicion is not a question

5

for defendant Farmer, but rather for the police co-defendants; and (4) defendant Farmer's status as a fellow law enforcement officer is irrelevant in analyzing his responsibility, as he was neither a supervisor of the defendant police officers nor from the same law enforcement agency.

The Court finds, however, viewing the well-pleaded facts in the complaint as true, it appears that the dispatcher gave deference to Defendant Farmer, even though what he reported did not amount to probably cause or reasonable suspicion that criminal activity was afoot. Trooper Farmer, by identifying himself to dispatch, would have known that the dispatcher and police officers would treat his report with greater credence than that of a private citizen. If Trooper Farmer hadn't called 911, moreover, it is certain that none of the events that followed would have occurred. As discussed by plaintiffs in response, the only one of the collective circumstances relayed by the dispatcher that an experienced law enforcement officer would attach value to is the fact that the report had come from another law enforcement officer. Under these circumstances, the Court believes that plaintiffs have sufficiently pled the person involvement of Defendant Farmer in Count I of their Complaint. Defendant Farmer's Motion to Dismiss (Doc. No. 15) is **DENIED.**

IV. **Defendants Rucker, Salsbury, Vaught and Hann's Partial Motion to Dismiss (Doc. No. 11)**

Defendants Rucker, Salsbury, Vaught and Hann (collectively, "police defendants") seek dismissal in Count I in both their individual and official capacities. Plaintiffs do not challenge dismissal without prejudice to the police defendants in their official capacities; therefore, the motion to dismiss will be **GRANTED IN PART** as to the official capacity claims against the police defendants in Count I of the Complaint.

6

With respect to the claims against the police defendants in their individual capacities, police defendants argue that qualified immunity applies as to plaintiffs' claims against them. "Qualified immunity shields state officials from civil liability when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Salau v. Denton, 139 F.Supp.3d 989, 1003 (W.D. Mo. 2015) (citing Holloway v. Reeves, 277 F.3d 1035, 1037 (8th Cir. 2002)). "To prevail at this stage of the proceedings, defendants must show that they are entitled to qualified immunity on the face of the complaint." Bradford v. Huckabee, 394 F.3d 1012, 1015 (8th Cir. 2005). "The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." Bradford, 394 F.3d at 1015 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 118 S.Ct 1708 (1998)).

To prevent dismissal pre-trial, "a plaintiff must show that (1) the facts demonstrate that the plaintiff suffered a violation of a constitutional or statutory right and (2) the right was clearly established at the time of the defendant's alleged misconduct." Brossart v. Janke, 859 F.3d 616, 624 (8th Cir. 2017). The first prong of the qualified immunity analysis "asks whether the facts taken in light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." Tolan v. Cotton, —U.S. —, 134 S.Ct. 1861, 1865 (2014)(internal citations omitted). "Courts have discretion to decide the order in which to engage these two prongs. But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking judgment." Id. As to the second prong –that the right was clearly established– the Supreme Court recently held in White v. Pauly, that the court's case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or

7

constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." White v. Pauly, —U.S. —, 137 S.Ct. 546, 552 (2017). Yet, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v.* Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 2718 (1982).

Here, police defendants first argue that they did not violate Mr. Kramer's constitutional rights as the stop was a consensual encounter that did not evolve into a Terry stop until Mr. Kramer fled from police. However, given the facts pled in the complaint, very little about the incident sounds like a consensual encounter; instead, it appears that from the beginning, the police defendants attempted to pin Mr. Kramer in a certain location by using their cars. Under these circumstances as pled, the Court cannot find the stop to be a consensual encounter.

In the alternative, the police defendants argue that grounds existed for a Terry stop at the beginning of the events, as they had a reasonable, articulable suspicion that criminal activity was afoot. "Officers need not be able to identify the specific crime the officer is investigating; rather the officer need only reasonably suspect that the individual is engaged in some kind of criminal activity." United States v. Fields, 2014 WL 5147610 at *4 (W.D.Mo. 2014) (quoting United States v. Guardado, 699 F.3d 1220, 1225 (10th Cir. 2012)). "The existence of reasonable, articulable suspicion is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience." United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010) (citing United States v. Arvizu, 534 U.S. 266, 273-74 122 S.Ct. 744 (2002)). Here, the police defendants argue that the information they received from

8

dispatch gave them a reasonable, articulable suspicion that Mr. Kramer had just trespassed on a fellow law enforcement officer's property. However, the dispatcher did not mention the word "trespass" at all; instead, the dispatcher conveyed that an individual had approached defendant Farmer's door, which is not a crime. Plaintiffs contend, and this Court agrees, that the Complaint alleges facts that "undermine any claim of reasonable suspicion by an experienced law enforcement officer. . . . even if true, the content of what Farmer reported did not rise to the level of providing reasonable articulable suspicion of any criminal activity." Doc. No. 23, at 8. Therefore, the Court finds that defendant's motion to dismiss must be denied on this basis as well.

With respect to police defendants' argument that no controlling authority existed in May 2016 demonstrating an officer could not perform a Terry stop under conditions such as what were pled, plaintiffs note that in United States v. Hughes, 517 F.3d 1013 (8th Cir. 2008), the Court found that the governmental interest in investigating a completed misdemeanor trespass did not outweigh the defendant's personal interest when facts do not seem to indicate risks to public safety. Id. at 1018. The Court finds Hughes to be the type of particularized, controlling authority necessary to satisfy the second prong of the qualified immunity analysis. Therefore, for all the foregoing reasons, police defendants' motion to dismiss their individual capacity claims must be **DENIED.**

**V. Conclusion**

Therefore, for the foregoing reasons, (1) Defendants Rucker, Salsbury, Vaught and Hann's Partial Motion to Dismiss (Doc. No. 11) is **GRANTED IN PART** as to the official capacity claims pled in Count I, and **DENIED IN PART** as to the individual capacity claims pled in Count I; (2) Defendant Farmer's Motion to Dismiss and Suggestions in Support (Doc. No. 15) is **DENIED**; and (3) Defendant Farmer's Unopposed Motion to [file]

Reply Suggestions in Support of Motion to Dismiss Out of Time (Doc. No. 24) is **GRANTED**, and the Court considers Defendant Farmer's proposed reply suggestions (Doc. No. 24-1) as timely filed.

    **IT IS SO ORDERED.**

Date: <u>August 15, 2017</u>                            **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                    Fernando J. Gaitan, Jr.
                                           United States District Judge